**CHU DRUA CHA, on his own behalf and on behalf of all others similarly situated, Appellant,**

v.

**Arthur E. NOOT, Commissioner of the Minnesota Department of Public Welfare, the Ramsey County Human Services Board, and Richard S. Schweiker, Secretary of Health and Human Services, Appellees.**

No. 82–1997.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1982.

Decided Dec. 29, 1982.

As Modified on Denial of Rehearing March 10, 1983. See 701 F.2d 750.

Law Offices of Southern Minnesota Regional Legal Services, Inc., Mark A. Bohnhorst, Berry Friesen, St. Paul, Minn., for appellant.

Warren R. Spannaus, Atty. Gen., State of Minn., John M. Burman, Sp. Asst. Atty. Gen., St. Paul, Minn., for appellee Arthur E. Noot.

James M. Rosenbaum, U.S. Atty. by Mary L. Egan, Asst. U.S. Atty., Minneapolis, Minn., Edith S. Marshall, Atty., Dept. of Health and Human Services, Washington, D.C., for appellee Schweiker.

Before ROSS, McMILLIAN and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

On March 12, 1982, the Secretary of Health and Human Services, one of the defendants in this case, published regulations, 47 Fed.Reg. 10841–50, reducing from 36 to 18 months the period during which the United States will reimburse states for cash and medical assistance to refugees under the Refugee Act of 1980, 8 U.S.C. §§ 1521–1525. The plaintiff Chu Drua Cha is a Laotian refugee living in Minnesota who had been receiving refugee cash assistance

and had been eligible for refugee medical assistance. He had been in this country more than 18 but less than 36 months, so his refugee assistance was terminated by the new regulation. He brought this suit claiming that payments to him should be continued until the State determines, after a hearing, whether he is eligible for continued aid at the same level under the Aid to Families with Dependent Children (AFDC) Program, created by Title IV–A of the Social Security Act, 42 U.S.C. §§ 601 et seq. The plaintiff contends that continued payments are required by the Due Process Clause of the Fourteenth Amendment and by regulations of the Department of Health and Human Services applicable to various public-assistance programs, 45 C.F.R. Parts 205, 206 (1981).

On August 13, 1982, the District Court[1] denied the plaintiff's motion for preliminary injunction. It found, among other things, that the plaintiff Cha had in fact received a hearing and been held ineligible for AFDC benefits. He had therefore apparently been given everything to which he was entitled and could not show any irreparable injury, whichever way the Fourteenth Amendment and the regulations might be interpreted. Cha appealed to this Court, and we expedited the appeal. The oral argument took place on September 14, 1982. The next day the State decided that Cha was indeed eligible for AFDC, and his benefits were reinstated at their pre-termination level. (Refugee cash assistance, as we shall see later in detail, pays the same amount of money as AFDC.) On October 26, 1982, the District Court ruled on plaintiff's pending motion for class certification, in response to this Court's request that it dispose of that motion. Class certification was granted. Defendants have not claimed that that ruling was an abuse of discretion, and we are convinced that it was not. The certification of a class makes irrelevant the individual infirmities of Cha's claim. It also prevents

1. The Hon. Edward J. Devitt, Senior United States District Judge for the District of Minnesota.

the appeal from becoming moot.[2] The legal questions raised by plaintiffs are therefore still alive, and we proceed to address them.

For reasons shortly to be explained, we hold that plaintiffs present a substantial constitutional question under *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The similarities and connections between the refugee cash assistance (RCA) program and AFDC are so close that a recipient of RCA might well have had a legitimate expectation that his RCA would not be terminated without prior notice and a hearing at which he would be given a chance to establish, if he could, that he was eligible for continued payments at the same level under AFDC or some other program of categorical assistance. The regulations should therefore be construed to avoid this constitutional question by affording to plaintiffs the pre-termination notice and hearing they seek. On the facts as they now appear, plaintiffs will prevail on the merits of their claim, and preliminary relief should be granted. The judgment of the District Court will be vacated, and the cause remanded with directions to grant a preliminary injunction reinstating benefits until the notice and hearing provisions of the regulations have been complied with. Unless the facts developed during the course of further proceedings on remand show that the required notice has in fact been given, or otherwise undermine the predicate on which our view of the law is based, the injunction should be made permanent after the case is tried.

## I.

Chu Drua Cha is a 43-year-old Hmong refugee from Laos.[3] He is married and the father of three children. He fought as a soldier before being forced to leave Laos because of the Vietnam War. He and his family fled first to Thailand, and then came to this country in December of 1979. In January 1981 Cha filed a general application for public assistance with the responsible Minnesota authorities. His application did not specify which form of assistance he wanted, or under which program he was seeking to qualify, whether Aid to Families with Dependent Children (AFDC), Supplemental Security Income (SSI), or Refugee Cash Assistance (RCA). The State reviewed the application and decided that Cha did not qualify for AFDC or SSI, presumably because he was thought to have neither the work experience requisite for AFDC nor the physical or mental disability requisite for SSI. He did qualify for RCA, however, because he was a refugee with the same low levels of income and resources as those prescribed for AFDC recipients. The State began to pay him RCA benefits monthly, and he was also declared eligible for refugee medical assistance (RMA), which provides the same services as those given Medicaid beneficiaries, but without requiring any of the specific conditions precedent (*e.g.,* qualification for AFDC) to Medicaid eligibility. Cha was not told that he was considered ineligible for AFDC, and at the time there was no reason for him to care, because he expected to receive RCA through December 1982, 36 months after his arrival in this country.

A word about the Refugee Act of 1980 is in order here to place in context what has been happening to Cha and other members of the class of refugees of whom he was typical before the State found that he was qualified for AFDC after all.[4] The statute

**2.** The District Court's order granting class certification expresses the view that the case would not be moot even if class certification were denied, because of an agreement among the parties that the State would apply to all similarly situated refugees whatever rules of law were declared in Cha's case. We were not aware of this agreement until November 12, 1982, when the District Court's order of October 26 was filed with us. Since class certification clearly suffices to prevent mootness, it is unnecessary for us to discuss the legal effect of the agreement.

**3.** We state the facts of Cha's case because in many respects they seem to be typical of the class.

**4.** The State seems to have decided in September 1982, after believing otherwise continuously since January 1981, that Cha in fact had worked long enough while in a refugee camp in Thailand to make him eligible for AFDC as an

added a new chapter to Title IV to the Immigration and Nationality Act of 1952. An Office of Refugee Resettlement was established within the Department of Health and Human Services, 8 U.S.C. § 1521, and the Director of that office was authorized to reimburse states for up to 100 per cent. of cash assistance and medical assistance "provided to any refugee during the thirty-six month period beginning with the first month in which such refugee has entered the United States," 8 U.S.C. § 1522(e)(1). The program was closely coordinated with other federally assisted programs of public assistance for which individual refugees might be eligible. If a refugee were eligible for AFDC, SSI, or Medicaid, then Refugee Act funds would go to the states only for what would otherwise have been the state, or nonfederal, share of program expenses. 8 U.S.C. § 1522(e)(4). In sum, a refugee not eligible for, say, AFDC benefits, would get federal funds for 36 months. A refugee who was eligible for AFDC would get the same amount of money, and all of it would come from federal funds, but funds authorized by the Refugee Act would cover only the "non-federal share." The rest would come from federal funds authorized under the Social Security Act. After 36 months, Refugee Act funds would cease, and the AFDC-eligible refugee would thereafter be supported by a combination of state and federal funds, just as non-refugee AFDC recipients are. At this stage, therefore, it was important for two reasons to determine which refugees qualified for AFDC and the like: (1) for purposes of deciding from which federal pocket the money would come for the first 36 months; and (2) for purposes of deciding which refugees would continue to be aided after the first 36 months.

Implementing regulations were first adopted on September 9, 1980. 45 Fed.Reg. 59318, 59323 (1980), codified as 45 C.F.R. Part 400. On December 11, 1981, the Secretary of Health and Human Services, in order to save money, issued proposed new regulations to reduce the period of 100% reimbursement from 36 to 18 months. 46 Fed.Reg. 60629–32. Despite protests, including one from the State of Minnesota, the final version [5] of the new regulations was issued on March 12, 1982, 47 Fed.Reg. 10841, and new § 400.62 ot 45 C.F.R. became the governing rule. The new rule became effective on April 1, 1982,[6] and makes a number of relevant changes in the Refugee Act program of cash and medical aid. The period during which states are reimbursed 100% for the costs of RCA and RMA is reduced from 36 months to 18, except for those refugees who are eligible for AFDC, SSI, or Medicaid, as to whom 100% reimbursement of the state share will continue for the full 36 months. In other words, refugees who are not eligible for AFDC, to take an example, will receive fully federally funded assistance for 18 months only. Even non-AFDC refugees, however, may receive state created general assistance (GA) after the initial 18 months, and states may apply for reimbursement for the cost of GA (which is at a lower level than AFDC) during the second 18 months

---

unemployed parent (AFDC–UP). We do not criticize the State for changing its mind. It is entirely possible that it was not informed of Cha's work history until shortly before the ruling in favor of his eligibility. There is also some indication that Cha's AFDC application may at one time have proceeded on another theory entirely—that he was eligible as an incapacitated parent (AFDC–IP).

5. Actually the Secretary refers to his regulation as an "[i]nterim final rule," 47 C.F.R. 10841. Comments, it was said, would still be considered if received by June 10, 1982. Perhaps there will someday be a "final final rule." In any case, the rule issued on March 12, 1982, is still in effect as we write, so we treat it as final for present purposes.

6. The Secretary announced an effective date of April 1, 1982, 47 Fea.Reg. 10841 but in Minnesota the Department of Public Welfare delayed implementation until May 1 1982 The State took this initiative to give itself and the refugees more time to adjust to the change. *Cf. Chhleat Ngou v. Schweiker,* Civil Action No. 82–0865 (D.D.C, order filed March 31, 1982) (effectiveness of new rule in the State of Washington stayed until May 1) The question whether Minnesota should be reimbursed by the United States for extra payments in April 1982 is not before us

of a refugee's stay in this country. As a result, refugees who, like Cha, were thought not to qualify for AFDC, have been taken off RCA after 18 months and placed on the lower-level assistance provided by GA. In Cha's case the change meant a reduction in cash assistance from $509 to $337 a month, as well as a reduction in available medical services from RMA (the equivalent of Medicaid) to those services available to GA recipients.

The State of Minnesota began efforts to notify RCA recipients of the new policy as soon as it learned of the United States' intention to put it into effect. Although plaintiff originally challenged the efficacy of the notice of the 36-to-18-month reduction itself, that challenge was rejected by the District Court and has not been renewed on appeal.[7] This appeal concerns the opportunity for RCA recipients in this country more than 18 months to qualify for continued receipt of benefits at the same level by showing themselves eligible under AFDC, SSI, or Medicaid. The State of Minnesota reviewed all its RCA files and determined that about 1000 RCA recipients were qualified under AFDC or the like. Another 450 or so RCA beneficiaries, however, were thought not to be so qualified, and these people, in the State's view, are entitled to assistance only at the lower GA level. This group, of which Cha was a member, were told that their RCA benefits were ending. A review of their files was conducted, and the State determined that they were ineligible for AFDC, but they were not told that they had been found ineligible, or even that their AFDC eligibility was being assessed. Instead, they were sent applications for GA along with notices

that their RCA was coming to an end. The notices given did not inform the group that a hearing was available to determine their AFDC eligibility, or that benefits could continue at the same level until a determination of AFDC eligibility could be made after a hearing.

This suit as originally brought charged primarily that adequate notice of the termination of RCA was not given, and that the State failed to re-evaluate refugees properly for other forms of assistance. The District Court found that adequate notice had been given and that the State and Ramsey County made conscientious efforts to place refugees on other programs. *Chu Drua Cha v. Noot,* Civil No. 3–82–1017 (D.Minn., findings and conclusions filed August 13, 1982). These findings are not contested in this Court. Plaintiff does urge, however, that the group of former RCA recipients being treated as ineligible for anything more than GA are entitled to have their benefits reinstated at their former level until they are determined to be ineligible for AFDC[8] after a hearing. This particular claim, though not mentioned in so many words in the District Court's order, was necessarily rejected by the order denying plaintiff's motion for a preliminary injunction. The District Court apparently regarded RCA and AFDC as legally entirely separate, and treated the terminated RCA recipients as nothing more than new AFDC applicants, entitled to no notice or hearing before denial of AFDC benefits.[9]

## II.

We begin with the fact that this is an appeal from an order on a motion for pre-

---

7. Nor is any question raised about the Secretary's power to issue the new regulation. It has been held valid by every court that has so far addressed the issue. *E.g., Chhleat Ngou v. Schweiker,* Civil Action No. 82–0865 (D.D.C. April 30, 1982).

8. We refer to AFDC eligibility most often in this opinion because that is the form of relief claimed by Cha. We express no view on whether SSI and Medicaid eligibility are analytically the equivalent of AFDC eligibility for purposes of our discussion.

9. The District Court's more recent order of October 26, however, seems to foreshadow the result we now reach. "The issue of the adequacy of notice to refugees who were denied alternate AFDC benefits ... is, in reality, the real issue in this case. It is clear that due process requires a notice to those whose claims have been rejected so that if so advised, they may appeal through administrative channels." Slip op. at 2.

liminary injunction. Normally we would not reverse such an order unless the District Court so far misapplied the relevant factors as to abuse its discretion. In addition, findings of fact in such a context, like those made after a trial, must be accepted here unless they are clearly erroneous. No one contends, and we do not believe, that any finding of fact made by the District Court in this case is clearly erroneous.

According to *Dataphase Systems, Inc. v. C L. Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc), four factors are relevant to the issue of preliminary relief: the likelihood of the moving party's succeeding on the merits of the case; the threat of irreparable harm to the moving party if the preliminary injunction is denied; the state of the balance between that harm and the harm that a grant of the injunction would inflict on other parties; and the public interest. *Id.* at 113, 114. We have no doubt that irreparable harm is occurring to the plaintiff class as each month passes without the AFDC level of benefits. Everyone seems to agree that, because of the Eleventh Amendment, see *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), we could not order a payment of retroactive benefits by the State to make up for past assistance unlawfully withheld. For some reason, the courts regard an order for the future payment of money, no matter what the amount, as somehow less destructive of state sovereign immunity than an order for the payment of sums past due.

Even if retroactive payments *could* be made, however,[10] the injury would still be irreparable. For people at the economic margin of existence, the loss of $172 a month and perhaps some medical care cannot be made up by the later entry of a money judgment. See, *e.g., Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) (complete loss of AFDC is such a serious deprivation that a post-termination hearing with retroactive reimbursement of benefits is constitutionally insufficient); *Turner v. Walsh*, 435 F.Supp. 707, 711 (W.D.Mo.1977) (termination or reduction of Medicaid benefits is sufficient irreparable injury to justify temporary restraining order), *aff'd per curiam*, 574 F.2d 456 (8th Cir.1978) (approving the district court's opinion as "well-reasoned"); *Nelson v. Likins*, 389 F.Supp. 1234, 1237, 1242 (D.Minn.1974) (loss of $80 to $100 a month in AFDC benefits is sufficient irreparable injury to justify preliminary injunction and denial of stay of preliminary injunction pending appeal), *aff'd per curiam*, 510 F.2d 414 (8th Cir.1975) (again referring to the "well reasoned opinion" of the district court).

The only other factor that deserves extensive discussion in the present context—and the main question presented on this appeal—is whether the plaintiff class is likely to prevail on the merits. That factor turns on an issue of law [11]—what kind of notice plaintiffs were entitled to—, and on

---

**10.** Under 45 C.F.R. § 205.10(a)(18), if a state agency after a hearing decides that benefits were wrongly denied to an initial applicant, "the agency shall promptly make corrective payments retroactively to the date the incorrect action was taken." A state which receives federal funds for an AFDC program must adopt a plan that includes this provision. Consent to such a plan may be a waiver of Eleventh Amendment immunity. This question has not been briefed on this appeal, and we intimate no view on it. It is also possible that retroactive benefits may be available administratively, whether or not the Eleventh Amendment is a bar to judicial relief. Counsel for plaintiffs stated at the oral argument their intention to seek retroactive payments administratively, and our opinion today is not intended to express any view with respect to this effort.

**11.** We assume for present purposes that the facts stated in this opinion will still be the facts found after the trial on the merits. If the facts turn out to be different, the predicate for the legal conclusions to which we have come may be significantly changed. If, for example, the State turns out in fact to have given the kind of notice that we hold the regulations require, obviously no injunctive relief will be in order. We have no intention of preempting the right and duty of the District Court to find the facts after plenary trial, or to entertain a motion by the defendants to set aside the preliminary relief we are directing if they think they can show that the facts justify such action.

questions of law we owe no deference in any formal sense to the District Court. If the District Court's assessment of the likelihood of plaintiff's prevailing on the merits is necessarily based on a proposition of law that we believe to be mistaken, then the denial of preliminary relief must be reversed, assuming that plaintiff has shown irreparable injury, as he has here. The factor of harm to defendants logically disappears. If, on our view of the law, plaintiff is entitled to win on the merits, then any harm to defendants is simply a consequence of the application of a correct rule of law, rather than a preliminary injunction that may turn out to be wrongly issued. The same is true of the "public interest" as a separate factor in the preliminary-relief calculus. If the issues of law that govern the merits have been fully briefed, if we are confident that plaintiff is entitled to prevail on those issues, and if he will be irreparably injured absent immediate relief, then a preliminary injunction should be granted. There is still a logical possibility that the factual underpinnings of our holding may change after a trial, or that our own legal conclusions may be rejected by the Supreme Court, and in either of those events the state defendants may suffer some monetary loss (perhaps reimbursable by the United States, see 45 C.F.R. § 205.10(b)(2), (3)), but we are sure enough about our own legal conclusions, shortly to be discussed, to make those risks tolerable. In short, where the issue presented is primarily one of law, and where there is irreparable injury to the plaintiff, preliminary relief is normally appropriate if the plaintiff will clearly prevail on the merits of the legal question.

### III.

The leading case on the constitutional protection afforded welfare recipients is *Goldberg v. Kelly, supra.* There, the Supreme Court held that "the Due Process Clause requires that the recipient be afforded an evidentiary hearing *before* the termination of benefits." 397 U.S. at 260, 90 S.Ct. at 1016 (emphasis in original) (footnote omitted). Such benefits were not merely a " 'gratuity,' " *id.* at 262 n. 8, 90

S.Ct. at 1017 n. 8, that could be withdrawn at will by the giver, but were rather "a matter of statutory entitlement for persons qualified to receive them." *Id.* at 262, 90 S.Ct. at 1017 (footnote omitted). If the government believes that benefits should be discontinued, it must give to the "recipient . . . timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 267–68, 90 S.Ct. at 1020. Benefits must continue until they are shown at the hearing to be unjustified, and after the hearing "the decision maker should state the reasons for his determination and indicate the evidence he relied on," *id.* at 271, 90 S.Ct. at 1022.

The regulations on which plaintiffs rely here were adopted in response to this decision of the Supreme Court, and they specifically say so. 45 C.F.R. § 205.10(a)(1)(ii). In order to receive federal money for certain specified programs, including AFDC, Medicaid, and SSI, a State must adopt a plan, to be approved by the Secretary of Health and Human Services, and the plan must provide for a system of hearings described in detail by the regulations. Minnesota has adopted such an approved plan. In cases of intended action to terminate or reduce assistance, "[t]he State or local agency shall give timely and adequate notice," 45 C.F.R. § 205.10(a)(4). "Timely" and "adequate" are defined as follows:

(A) "Timely" means that the notice is mailed at least 10 days before the date of action, that is, the date upon which the action would become effective;

(B) "Adequate" means a written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, the specific regulations supporting such action, explanation of the individual's right to request an evidentiary hearing (if provided) and a State agency hearing, and the circumstances under which assistance is continued if a hearing is requested . . . .

45 C.F.R. § 205.10(a)(4)(i)(A), (B). And "[i]f the recipient requests a hearing within the timely notice period," 45 C.F.R. § 205.-10(a)(6),

> (i) Assistance shall not be suspended, reduced, discontinued or terminated, (but is subject to recovery by the agency if its action is sustained), nor may the manner or form of payment be changed to a protective, vendor, or two-party payment under § 234.60, until a decision is rendered after a hearing . . . .

45 C.F.R. § 205.10(a)(6)(i).[12]

*Dilda v. Quern,* 612 F.2d 1055 (7th Cir.) (per curiam), *cert. denied,* 447 U.S. 935, 100 S.Ct. 3039, 65 L.Ed.2d 1130 (1980), is a good example of how *Goldberg* and the implementing regulations have been applied in practice. There, a state was "rebudgeting" recipients' income and reducing or cancelling their AFDC benefits accordingly. The notice stated simply that the state "has re-budgeted your income and the appropriate change has been made." *Id.* at 1056. It was held insufficient under the Due Process Clause of the Fourteenth Amendment. The court held that recipients had to be given "a breakdown of income and allowable deductions," *id.* at 1057, as recomputed by the state, in order to have a fair chance to show that the state had made a mistake. Just so, in the case before us, if the regulations apply, the plaintiffs would need to know why they were considered ineligible for AFDC. Otherwise, they would have no way to rebut that conclusion. But most of the plaintiffs, at least in Ramsey County, seem never to have been told that their AFDC qualifications—as opposed to their RCA benefits as such, which depended merely on duration of residency in this country—were being reviewed, let alone given reasons why the result of the review was unfavorable.

In *Goldberg* and *Dilda,* of course, people already on AFDC were claiming a continued entitlement to precisely the same category of benefits. Here, people on RCA are not claiming that RCA as such should continue. A valid regulation has terminated their right to RCA because they have been in this country longer than 18 months. Plaintiffs here claim rather that they should continue receiving the same amount of money because they are qualified under the technically distinct AFDC program. Defendants counter that so far as AFDC is concerned plaintiffs are nothing more than new applicants, entitled perhaps to some kind of notice and hearing, but not to continued receipt of benefits pending the outcome of the administrative process. In order to prevail, plaintiffs must show that RCA and AFDC cannot be so neatly distinguished from each other, that they are, in the light of law and administrative practice, only two parts of a larger whole. If this is so, then it would be logical, especially as a constitutional question could be thus avoided, to interpret the regulations, in express terms applicable only to certain categorical programs under the Social Security Act, to apply as well to the present situation, where plaintiffs seek in effect a conversion of their cases from RCA to AFDC, rather than to be treated as strangers beginning the AFDC process from square one.

The only case cited by either side that is directly in point favors plaintiffs' position. In *Cha Vang Seng v. Gibbs,* Civil Action No. C82–337C (W.D.Wash. June 29, 1982), a preliminary injunction was granted in the same kind of situation that this case presents. The court held that "a sufficient nexus exists between the special refugee assistance and AFDC, SSI and Medicaid," slip op. at 10, to require that RCA payments continue until the notice and hearing provided by the regulations had been afforded.

From a practical perspective, the line between the programs is fuzzy. The refugee, up until the reduction from 36 to 18 months, was unconcerned under which

---

12. There are some exceptions to the requirement of timely notice. See 45 C.F.R. § 205.-10(a)(4)(ii). One of them applies when "[a] special allowance granted for a specific period is terminated and the recipient has been informed in writing at the time of initiation that the allowance shall automatically terminate at the end of the specified period . . . ." 45 C.F.R. § 205.10(a)(4)(ii)(I). Defendants have not suggested that this exception applies here.

program he was placed. The level of benefits were the same. From the State's perspective, the programs were all federally financed to the same extent and all state-administered. Finally, from the Federal perspective, the Federal commitment under all the programs was for the full 36 months. Thus, it is not unusual that the refugee, State and Federal government would view the entire resources designed for and available to refugees as part of one large refugee assistance "package." It was only after the reduction in one aspect of the assistance "package," with the subsequent significant consequences depending upon where one was in the program, that the distinction was brought home.

*Id.* at 11.

Before examining further the validity of this holding, we note that other public-assistance programs, formally distinct to a greater or lesser extent, have on occasion been treated as interchangeable for purposes of the notice-and-hearing regulations. A leading example is our own decision in *Johnson v. Mathews,* 539 F.2d 1111 (8th Cir.1976). The plaintiffs there had been receiving benefits from the State of Missouri under a federally aided program called Aid to the Permanently and Totally Disabled (PTD). Congress decided to stop funding this program and to create instead a federally administered and federally funded program under a new Title XVI of the Social Security Act. Social Security Amendments of 1972, Pub.L. No. 92–603, § 301, 86 Stat. 1465. Originally, Congress decided that anyone receiving PTD benefits in December 1973, the last month before the new program, to be known as SSI, came into existence, would automatically be considered disabled and eligible to receive the new SSI benefits. On December 31, 1973, however, Congress excluded from this automatic carryover anyone who had not received PTD benefits for at least one month prior to July 1973. Act of December 31, 1973, Pub.L. No. 93–233, § 9, 87 Stat. 957; *see* 42 U.S.C. § 1382c(a)(3)(E). *Johnson* was a case brought on behalf of this excluded class: people who were on PTD as of December 31, 1973, but who had begun receiving PTD benefits after July 1, 1973. Their benefits were continued administratively for a brief period, but were then terminated after an initial determination of non-disability, a determination made after a paper review of their records and without prior notice or opportunity to be heard.

The District Court issued a temporary restraining order directing that SSI payments to the plaintiff class be continued until they were given a pre-termination hearing. This order was later incorporated into a permanent injunction, and we affirmed. After analyzing the prior status of the plaintiff class as PTD beneficiaries, the policies and practices of the Secretary of Health, Education, and Welfare, and the applicable statutes, we held that the excluded class had a "legitimate claim of entitlement to, and thus a property interest in, the continued receipt of benefits," 539 F.2d at 1119, notwithstanding Congress's express enactment narrowing the group whose benefits would continue automatically. We noted, among other things, that "[t]he SSI program is basically a continuation and extension of the prior federal-state programs," *id.* at 1118 (footnote omitted), and we specifically rejected the Secretary's contention, similar to the argument advanced here, that "the cessation of payments to plaintiff was not a termination but rather was an initial determination of ineligibility under a new program." *Id.* at 1118–19 n. 8. "The intended beneficiaries are the same under both programs and the disability eligibility requirements are similar." *Id.* at 1119. We went on to hold that due process required pre-termination notice and hearing, much as provided by the regulations adopted in response to *Goldberg.*

*Stenson v. Blum,* 476 F.Supp. 1331 (S.D. N.Y.1979), *aff'd mem.,* 628 F.2d 1345 (2d Cir.), *cert. denied,* 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980), and *Budnicki v. Beal,* 450 F.Supp. 546 (E.D.Pa.1978), are examples of the same kind of analysis. *Stenson* involved people who had been receiving SSI benefits and were therefore eligible for Medicaid as "categorically

needy." They had been told that their SSI eligibility had ended. The case holds that they must nevertheless be continued as Medicaid recipients pending a determination whether they might be eligible for Medicaid on some other basis. Federal Medicaid regulations, similar to the AFDC regulations involved here, were construed to achieve this result. In *Budnicki* Pennsylvania Medical Assistance (MA) recipients who had been told they would no longer receive state-funded orthopedic shoes were held entitled to a pre-termination hearing on the question whether they might still be entitled to the shoes under some other provision of the MA program.

The parties before us naturally differ as to the utility of these cases for present purposes. Defendants claim, for example, that the similarities and connections between PTD and SSI in *Johnson* are greater than the similarities and connections between RCA and AFDC here. None of the cases (except *Cha Vang Seng*) is directly in point, and each of them presents some relevant differences cutting one way or the other. They do establish at least this much, however: there are some benefit programs so closely related in law and fact that one may not be taken off program A without first being given notice and a hearing with respect to one's qualifications under program B. Our task is not so much to match the facts of this case with the facts of others, as to analyze closely the legal and administrative situation before us, in order to decide whether the relationship between RCA and AFDC is close enough to require that the notice-and-hearing regulations be applied. To that inquiry we now turn.

### IV.

#### A.

We first analyze the law and regulations applicable to the two programs.

The Refugee Act of 1980 recognizes the relationship between the RAP and other forms of assistance in many ways. For one thing, under 8 U.S.C. § 1522(e)(4), a refugee who is eligible for aid in the form of AFDC may not be assisted with 100% RCA funds. Rather, funds authorized under the Refugee Act may be used only for the non-federal share of assistance to such persons. Thus, the very statutory definition of the RCA program requires an answer to the question whether the persons aided are also eligible under AFDC. The two kinds of payments are, so to speak, the reciprocal of each other. Congress also directed the Secretary, no later than March 17, 1981, to analyze "the desirability of using a system other than the current welfare system for the provision of cash assistance . . . to refugees . . . ." 8 U.S.C. § 1523(b)(2). It was clear, therefore, that Congress contemplated that the current welfare system would be, at least initially, the vehicle for delivery of RCA payments, thus making connections in practice among the various kinds of welfare payments inevitable.

The rule that precipitated this litigation continues to recognize the connections among the various kinds of payments. "This interim final regulation . . . establishes new policies on cash and medical assistance available to refugees . . . who are ineligible for Aid to Families with Dependent Children (AFDC) . . . ." 47 Fed.Reg. 10841 (1982). Thus, under the new policy, the reduction in the duration of payments from 36 to 18 months, so far as 100% federal reimbursement is concerned, requires, as a logical condition precedent, that a determination first have been made that the recipients whose benefits are being reduced are not eligible for AFDC. This, of course, is a continuation of current practice. "Under current RRP [refugee resettlement program] policy, when a refugee applies for cash and/or medical assistance, a State must first determine eligibility under the AFDC, SSI or adult assistance programs and/or Medicaid. *States must comply with all regulations operative in the State regarding applications, determinations of eligibility, and furnishing of assistance under these federally aided programs.*" 47 Fed. Reg. 10842 (emphasis supplied). The underscored sentence must mean, at the very least, that initial applicants for RCA, if the state believed them to be ineligible for

AFDC, should have been so informed, and should have been given reasons for the determination of ineligibility, so that an appeal could have been filed at that time. So far as we are aware, this was never done by the Minnesota Department of Public Welfare. People in Cha's position, therefore, who applied for aid and were given RCA payments, were never told that they had been determined ineligible for AFDC, or that they could contest such a determination, either at the time RCA benefits were begun, at the time they terminated, or at any other time.

In addition, so far as payment levels and need standards are concerned, the regulations make RCA and AFDC almost indistinguishable. "In determining need for refugee cash assistance, a State *must* use the State's AFDC need standards ...." 47 Fed.Reg. 10849 (1982) (to be codified at 45 C.F.R. § 400.62(b)) (emphasis supplied). Payment levels, also, must be "100% of the payment level which would be appropriate for an eligible filing unit of the same size under the AFDC program." *Ibid.* (to be codified at 45 C.F.R. § 400.62(d)). And in determining income and resources of applicants for and recipients of RCA, "the State agency must apply standards and criteria identical to those provided for ... AFDC applicants and recipients," with one insignificant exception. *Ibid.* (to be codified at 45 C.F.R. § 400.62(c)). The only major difference between AFDC and RCA, therefore, is that some kind of work experience is needed for AFDC, or at least for AFDC as an unemployed parent (AFDC–UP), which seems to be the principal form of AFDC at issue in this case. Otherwise, eligibility standards and payment levels in the two programs are virtually identical, not because Congress made them so in the statute, but because the Secretary made them so in his regulations.

In these circumstances, it does not seem at all unreasonable to interpret the AFDC regulations as applying also to RCA. The differences between the two programs, although they are real and can be precisely described by those who have had an ample opportunity to study the details of the statutes and regulations, are simply not material enough as a practical matter to destroy an RCA recipient's legitimate expectation that benefits would be continued so long as his AFDC eligibility had not been rejected after a process that includes a fair opportunity for a hearing. This conclusion is fortified, we think, by an examination of how the programs operated in practice in Minnesota, for this practical conduct is itself an administrative construction of the regulations that carries great weight. When the law, the regulations, and actual practice are thus taken together, we think they show that the RCA program, although authorized by a separate statute and technically distinct in some respects, was merely a special overlay intended to operate as part of the existing categorical-program framework. A remark made by the Secretary in explaining the choice to adopt the AFDC payment levels for RCA purposes is instructive at this point. "In addition, the use of AFDC payment levels is advantageous from an administrative standpoint, since eligibility determination procedures and payment structures already in place in the AFDC program can be utilized in the Refugee Program." 47 Fed.Reg. 10845 (1982). One such "eligibility determination procedure" is the very regulation for which plaintiffs contend here, requiring that payments be continued to existing recipients until a determination of ineligibility can be tested by notice and hearing.

### B.

The AFDC and RAP programs were administered in a closely connected fashion in actual practice. An "Instruction" issued by the Department of Health, Education, and Welfare, as it then was, in 1977 [13] told state

---

13. The Instruction was issued under a predecessor statute, apparently the Indochina Migration and Refugee Assistance Act of 1975, Pub.L. No. 94–23, 89 Stat. 87. For a good general discussion of the evolution of refugee aid statutes, see Martin, *The Refugee Act of 1980: Its Past and Future,* in *Transnational Legal Problems of Refugees, 1982 Michigan*

welfare authorities that the two programs were, in effect, two sides of the same coin. The states were told that refugee assistance cases should be evaluated for AFDC and Medicaid eligibility. If AFDC eligibility was found, then refugees would be transferred to that program. The transfer was to be treated as a "conversion" rather than a new application for AFDC, and the states were given discretion to treat the date of the initial RCA application as the date of application for purposes of determining an applicant's quarters of work. (Eligibility for AFDC–UP depends, in part, on the applicant's having worked for six of 13 recent quarters preceding the date of application. See 45 C.F.R. § 233.100(a)(3)(iii).) New applications were first to be evaluated for AFDC eligibility. If no such eligibility were found, then the application would be evaluated under the RAP program proper, using virtually the same definition of poverty, but without the previous-work requirement. We have no reason to doubt that the State of Minnesota followed this procedure both before and after the enactment of the Refugee Act of 1980. If a RAP case placed on the rolls as such, and later found to qualify for AFDC, is treated as a conversion from one form of AFDC to another, and not as a new application, then the obverse should follow: a RAP case about to be terminated as such, but involving the possibility of a transfer to AFDC, is not the same as a new AFDC application, but rather a conversion from one form of closely comparable entitlement to another. That is in effect the whole contention of the plaintiff class, and it is borne out by the administrative conduct of the responsible federal and state officials. In Cha's case, for example, when the application for benefits was evaluated, the state seems to have found Cha ineligible for AFDC. The notice it sent, however, did not reveal this fact. It simply stated, instead, that RCA benefits

had been approved. If Cha had been a lawyer intimately familiar with the welfare and refugee statutes and regulations, he might have realized that this notice necessarily implied that the state considered him ineligible for AFDC, but it goes wholly beyond the bounds of reason to impute this kind of knowledge to most citizens, to say nothing of strangers in a strange land.

When the time came for the state, by reason of the change in federal regulations, to let recipients know that their RCA benefits were being terminated, the same intimate relationship between the two formally distinct payment programs persisted. On December 7, 1981, by Instructional Bulletin No. 81–86, issued by the State Department of Public Welfare to County Human Services Boards, local authorities were directed to review each RCA file for AFDC eligibility. They were told, in addition, that "the agency may base its actions on an existing application taken at the time that the family applied for RAP benefits." Designated Record (D.R.) 52. The agency, in other words, was told to treat each RCA recipient as having also applied for AFDC. If a recipient was found ineligible for AFDC, but eligible for GA, the state instructed that a ten-day notice be sent, informing recipients of their right to appeal. This reference to a ten-day notice appears to be an acknowledgement by the state that the regulations quoted above do govern the RAP program, though the December Instructional Bulletin did go on to say, without citing any authority, that grant payments should not be continued, even if a timely appeal were filed.

Thereafter, the immediate threat of reduction or termination of federal funding abated, but after the March 12, 1982, regulations were issued, the state issued a new Instructional Bulletin, No. 82–30, dated March 31, 1982. This Bulletin again in-

---

*Yearbook of International Legal Studies* 94–97. The Instruction, styled "Action Transmittal, SSA–AT–77–11 (OFA)," was issued on December 2, 1977. At the oral argument counsel for the federal defendant attempted to downplay the legal significance of the Instruction by pointing out that it had never been published as

a regulation. In this day and age of the welfare state, however, there is a great deal of "law" that is neither statute nor formal regulation. There is a whole world of law of lesser dignity in form—Instructions, Bulletins, opinions, letters—but of equal effect in practice.

structed counties to evaluate refugees for their eligibility for categorical programs. Those persons found ineligible should be sent a ten-day notice of termination or reduction, and notified of their right to appeal and right to apply for other programs. This Bulletin stated explicitly that grants would be continued pending the outcome of an appeal. The March 31, 1982, Bulletin stated: "If the client appeals prior to the effective date of the proposed action the grant shall be continued at the client's request and at the present amount until the appeal decision is reached." D.R. 66. As long ago as last March, therefore, the state DPW seems to have interpreted the regulations to require the same kind of notice and continuation of benefits for which plaintiffs are now contending.

We cannot be sure on this record of the extent to which this Instruction was obeyed by the various county boards. The record before us seems to be limited to Ramsey County,[14] and even as to Ramsey County applicants different notices may have been sent to different people. In Cha's case, for example, a notice sent on May 20, 1982, did say that his grant would continue at its former level (the reduction to GA having taken effect on May 1) if he filed a timely appeal. D.R. 82. He was not clearly told, however, that the state had determined him ineligible for AFDC, so it was hard for him to tell exactly what it was that could be appealed, or to know that the crucial fact in his case could be the work he had done in Thailand. In the case of Chang Xiong, an intervenor in the District Court,[15] a notice was sent on April 20, 1982, to the effect that benefits would be reduced to the GA level on May 1, but Xiong was not told that he had been evaluated and found ineligible

for AFDC. Apparently another notice he received stated that "[i]n most cases your assistance will continue while the state is deciding" your appeal, D.R. 91, but that advice may have mystified Xiong as much as it does us. No explanation was given of the phrase "in most cases," nor would Xiong know that he could appeal from the state's determination that he was ineligible for AFDC, since he did not know that such a determination had been made.

A sampling of other files that were before the District Court bears out these impressions. Files were reviewed in good faith to determine AFDC eligibility, and only those recipients found ineligible for AFDC were sent notices that their RCA was being terminated together with application packets to enable them to try to get GA benefits. But typically the notices failed to state that the recipients had already been evaluated and found ineligible for AFDC. In addition, in those cases where an effort was made to determine AFDC eligibility on the basis of something other than information already in the files, inquiries made of the recipients concerned only work that they might have done in the United States. Work done in refugee camps in Thailand or elsewhere was not asked about, though it is undisputed that work performed in Thailand is every bit as good for purposes of AFDC qualification as work performed in this country. In addition, some of the notices of termination must have been incomprehensible to the recipients, since they are virtually so to us. One notice, for example, stated that an "AFDC–IRAP grant" had been terminated. D.R. 133. We are not sure what "IRAP" means, unless it is Indochinese Refugee Assistance Program. Another notice in-

---

14. The District Court's order of October 26, 1982, has certified a class containing "[a]ll persons in Minnesota whose refugee assistance benefits have been reduced or terminated because they have been in the United States more than 18 months." The Court went on to observe "that a more appropriate class probably should cover refugees only in Ramsey County rather than in the whole state. It may also turn out that the class should be further limited to only those refugees who have not been noti-

fied of their ineligibility for other forms of categorical assistance." These observations seem to have merit, and it will be for the District Court after remand, in its discretion, to decide whether the class previously certified should be modified in these or other respects.

15. After the oral argument Xiong moved for leave to intervene as a party in this Court, but the motion was later withdrawn without a statement of reasons.

formed a recipient that his "AFDC grant" had been terminated, D.R. 138, though the defendants now stoutly insist that none of the RCA recipients had ever been on AFDC, the programs being entirely separate in law and fact. A long list of RCA recipients were told that their "AFDC" benefits had been terminated, and the reason given was: "Federal Funding for the Refugee Assistance Program is Unavailable." D.R. 153–72. The unavailability of federal funds for RCA payments, of course, was in no sense a reason for termination of AFDC benefits, nor for a decision not to award such benefits in the future, because even after the March 12 regulations had reduced federal participation, federal RAP funds were still available for the nonfederal share of payments to AFDC-eligible refugees, even those who had been in the country longer than 18 months. In short, although the state made a valiant effort under difficult circumstances to give proper notices and to minimize hardship to refugee clients, the notices given were in many cases confused and cryptic. The state's course of conduct does show one thing clearly. It regarded the AFDC and RAP programs as facets of the same effort. Both from the point of view of the state and from that of the recipients, AFDC and RAP were closely connected, and for us now to hold that AFDC and RAP are legally and factually distinct would not be realistic.

### C.

We conclude that there is a substantial probability, because of the legal interconnections between the two programs and because of their joint administration as a practical matter, that recipients could reasonably have had a legitimate expectation that their RCA benefits would not be terminated without their being given an opportunity to show that the same payment level should be continued under the AFDC rubric. In other words, the interest of RCA recipients in continued receipt of benefits at the AFDC level was probably substantial enough to be considered "property" under the Due Process Clause of the Fourteenth Amendment, as interpreted in *Goldberg v.*

*Kelly, supra.* We deem it unnecessary to hold directly that the state's failure to give the kind of notice plaintiffs argue for was unconstitutional. Instead, we simply interpret the regulations to require that such notice be given, thus avoiding the constitutional question. This interpretation certainly accords with the spirit of the regulations, and indeed seems actually to have been expected by the state at one point during the changeover from RCA to other forms of assistance. We hold, therefore, that RCA recipients in this country more than 18 but less than 36 months were entitled, before their benefits were terminated or reduced, to a notice stating the intended termination or reduction, and informing them of their right to appeal and that benefits would be continued until they were determined ineligible to receive the same level of assistance under one of the categorical programs.

### V.

The judgment of the District Court will be vacated, and the cause remanded for entry of a preliminary injunction in accordance with this opinion. We use the term "vacated" rather than "reversed" advisedly. If we were deciding this case on the basis of the situation as it existed at the time of the oral argument, we might well be affirming the order of the District Court. Developments since the oral argument have changed the situation. Foremost among these developments is the District Court's certification of a class, to which we have already referred. This action not only prevented the case from becoming moot; it made unimportant the fact that Cha, or any other individual member of the class, might already have been determined ineligible for continued benefits after a hearing.

For reasons we have already given, we think the class is entitled to the relief set forth above. We reiterate that this holding is provisional, in the sense that the District Court may later decide to modify the class, or may find that the facts recited in this opinion as to the kind of notice given are not supported by the evidence as later de-

veloped, either in a plenary trial on the merits, or in an evidentiary hearing on a motion to set aside or modify the preliminary injunction whose entry we are directing. Our action is also without prejudice to the contentions of the state and federal defendants, which they may assert on remand in the District Court, with respect to a federal obligation of reimbursement for benefits that the state must pay as a result of the preliminary injunction.

Vacated and remanded with instructions.[16]

It is so ordered.

16. On December 20, 1982, a second appeal from the District Court's order was docketed in this Court. *Vang Nou Xiong v. Arthur Noot,* No. 82–2519. This appeal was brought by a new plaintiff-intervenor, after the District Court granted a timely motion for extension of time within which to file a notice of appeal. Our opinion today also disposes of No. 82–2519, and that cause is also remanded to the District Court.